Filed 2/11/14  P. v. Hudson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C070127 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF090005666) |
| v. | |
| CORY HUDSON, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 13, 2014, be modified as follows:

1.     On page 3, the last sentence of the second full paragraph, commencing with "The backpack contained," is modified to read as follows:

The backpack contained twenty-five $20 bills wrapped in a label stating "five hundred" and two baggies of marijuana weighing approximately 228 grams and 125.4 grams each.

2.     On page 11, the fourth sentence of the second full paragraph, commencing with "Defendant had been contributing," is modified to read as follows:

Defendant had been donating his time and effort to the collective and believed he was paid $500 for his participation in the collective.

1

There is no change in the judgment.

Appellant's petition for rehearing is denied.

BY THE COURT:

          RAYE          , P. J.

          NICHOLSON     , J.

          MURRAY       , J.

Filed 1/13/14 (unmodified version)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br> v.<br><br>CORY HUDSON,<br><br>   Defendant and Appellant. | C070127<br><br>(Super. Ct. No. CRF090005666) |

After defendant Cory Hudson drove down a road, weaving across the double-yellow line, an officer pulled him over. The officer smelled a strong odor of marijuana and found a variety of drugs and drug paraphernalia in the car. An information charged defendant with transportation of marijuana, possession of marijuana for sale, and possession of concentrated cannabis. (Health & Saf. Code, §§ 11360, subd. (a), 11359, 11357, subd. (a).)[1] A jury found defendant guilty of possession of marijuana for sale but

---

[1] All further statutory references are to the Health and Safety Code unless otherwise designated.

1

not guilty on the other two counts.  The trial court sentenced defendant to three years' probation and 180 days in jail, with 60 days stayed upon successful completion of probation, and ordered defendant to register as a narcotics offender.  Defendant appeals, arguing the trial court failed to properly instruct the jury on his medical marijuana defense and challenging the testimony of the prosecution's expert witness on possession of marijuana for sale.  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Late one night in November 2009 Michael Simpson, a California Highway Patrol (CHP) officer, pulled over a car driven by defendant.  A search of the car unearthed drugs and drug accoutrements.  An information charged defendant with transportation of marijuana (count 1), possession of marijuana for sale (count 2), and possession of concentrated cannabis (count 3).  A jury trial followed.

**Traffic Stop and Search**

As Officer Simpson drove northbound on a Yolo County road he observed a car repeatedly weaving across the double-yellow line into the southbound lane.  When Officer Simpson pulled over the car, he smelled a strong odor of marijuana and asked the driver, defendant, if there was anything illegal in the car.  Defendant replied, "No." Officer Simpson asked defendant's passenger, defendant's son, if there was anything in the car he needed to know about.  Defendant's son Ross said there were two marijuana cigarettes in the car.

Officer Simpson's search unearthed a burnt joint under Ross's seat and another to the side of the seat.  In the car's center console, the officer found a blue plastic container with bottles containing marijuana, a marijuana joint, scissors, and a film canister with 9.65 grams of a brown substance later identified as concentrated cannabis.  One bottle bore defendant's name and listed its contents as hydrocodone, generic Vicodin.  Another bottle was labeled:  "For medicinal use only as defined in California Health and Safety

2

Code Section 11362.5(b)(I)(A) and 11362.7 not for resale. Type, green, crack weight one eight."

Woodland Police Officer Olson responded to the scene with a drug dog in tow and ran the dog through the car. After the dog was finished Officer Simpson resumed his search and found a day planner in the back seat. In the planner were $220 and a large plastic bag containing 17 smaller baggies. A black zippered duffle bag sat on the back seat. Officer Olson told Officer Simpson his dog had "hit" on the bag. A search of the bag revealed a small portable scale, garden scissors, and two other pairs of scissors.

In the trunk, Officer Simpson found a green container of prescription bottles that held marijuana, a couple of plastic jars, and a meal grinder used to grind marijuana and separate the stem from the bud. Defendant's son Ross claimed the items belonged to him. The trunk also contained an ice cooler with a camouflage backpack inside. The backpack contained twenty-five $20 bills wrapped in a label stating "five hundred"and two baggies of marijuana weighing approximately 245.5 grams and 125.4 grams each.

**Statements to Officers**

Following defendant's arrest, officers advised him of his *Miranda* rights.[2] Defendant waived his rights and told Officer Simpson he grows marijuana. He also claimed ownership of the backpack and the marijuana in it, and of the items in the blue container in the center console. Defendant stated the container held his personal medicinal marijuana. He was taking the marijuana to sell to marijuana cooperatives throughout Sacramento. The money in the backpack came from one such transaction. He had not been able to sell all the marijuana. Inside the film canister was hash he made at his collective, concentrating the THC into a more potent form.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

3

Ross also waived his *Miranda* rights. He told Officer Simpson that defendant picked him up after defendant went to the "medicinal shop." Ross admitted ownership of the green container in the trunk and its contents. The marijuana joints in the car were also his. The bag in the other container was not his. Although the money did not belong to him, he knew it was there and knew there was marijuana in the bag. Ross said he was allowed to have eight ounces of marijuana or less on him, and eight ounces of the marijuana was his. He did not know how much was in the bigger bag of marijuana. Ross did not go to the medicinal shop and did not buy or pack the marijuana.[3]

**Preliminary Hearing Testimony**

Defendant's preliminary hearing testimony was read to the jury. In June 2008 defendant obtained a one-year doctor's recommendation for therapeutic cannabis, which was renewed the following year. Defendant has an outdoor marijuana garden where each plant uses at least three cubic-yard bags of fertilizer that cost up to $20 per bag. It costs approximately $100 to produce one ounce of marijuana, and each plant yields about 12 ounces of usable drug.

Defendant, his mother, and Ross all have recommendations for therapeutic cannabis and are allowed up to six plants each. The garden had fewer than 18 plants. Of the bag of marijuana found in the trunk, one-third belonged to him and the rest belonged to his mother and Ross.

The marijuana was for their personal use; defendant did not mention selling the marijuana. Instead, he took the marijuana to a cooperative collective (co-op) to donate it. He donated four to five ounces; he did not weigh the remainder. Defendant has a contract with the co-op. The co-op paid him $500 for the donation, compensation for his time and labor. Defendant received the money a few hours before the traffic stop.

---

[3] Ross's interview was played for the jury.

**Expert Testimony**

CHP Officer David Diaz, a 15-year veteran of the force, served on the narcotic enforcement team for the two and a half years prior to trial. He testified as an expert in the possession, sale, cultivation, use, and effects of marijuana.

Officer Diaz received training in basic narcotic investigation and attended a two-week narcotics school on the use, packaging, and sale of marijuana. He also attended a 24-hour indoor and outdoor cultivation class taught by law enforcement.

Officer Diaz testified he has interviewed people with medical marijuana recommendations who grow their own marijuana and others who grow without a recommendation. In addition, he expressed familiarity with how marijuana is grown and packaged, and the related paraphernalia.

Officer Diaz has spoken with individuals who have medical marijuana recommendations and sell, donate, or provide marijuana to dispensaries, cooperatives, or collectives. They described the methods by which they provide the marijuana as well as the amounts. According to Officer Diaz, the aim of a collective is to share marijuana, labor, and costs equally.

While working undercover, Officer Diaz visited two dispensaries on three occasions. On one visit he walked in and an employee asked if he was a vendor or a patient. He said he was a patient. After purchasing marijuana, he told the employee that he had friends who did not have recommendations and needed to sell some marijuana. The employee responded that Officer Diaz's friends could give Diaz the marijuana and the dispensary would buy it from him as long as he had a recommendation. The employee told Officer Diaz to bring "a pound. Just go ahead and bring whatever you have."

The dispensaries Officer Diaz contacted sold him marijuana in an "eight ball," or 3.5 grams, but he believed they also sold larger quantities. Some prescriptions provide different amounts, but often there is not a prescribed amount.

5

In Officer Diaz's opinion, if someone had two large bags of marijuana, one with 125 grams and the other a little less than 245 grams, or together about 12 ounces, that would be a large amount and would lead him to strongly suspect it might be for sale. The existence of a medical marijuana recommendation would be but one factor to consider, since an individual with a recommendation can legally possess only eight ounces. Officer Diaz's conversations with medical marijuana users mitigated against concluding such a large amount was for medicinal use, because they carry only what they need, a few grams. A medical marijuana user would need only two to three grams of concentrated cannabis.

Officer Diaz also opined that carrying 12 ounces of marijuana in a duffle bag in a cooler in the car trunk was consistent with concealment. The cooler would mask the odor. The presence of a scale would increase Officer Diaz's suspicion that the marijuana was possessed for the purpose of sale. Similarly, if an individual had $500 in cash, that would strengthen his opinion on possession for sale. The presence of an additional six $20 bills and a $100 bill would reinforce his opinion, as would the presence of 17 baggies.

Ziploc baggies are used to package marijuana for sale and would not be consistent with someone selling marijuana to a dispensary because dispensaries buy in bulk. Dispensaries buy in ounces, not grams. The scale defendant possessed was too small to be able to weigh more than two or three ounces. A dispensary would have its own scale that could measure larger amounts.

Officer Diaz has investigated outdoor marijuana gardens, large and small. Recently he checked out eight houses to ensure compliance with legal guidelines: eight ounces, six mature plants, 12 immature plants. Residential gardens usually yield only one to two pounds per plant under average conditions. However, Officer Diaz has seen plants yielding about three pounds each, making defendant's estimates of his plants' productivity low.

In addition, Officer Diaz found defendant's testimony concerning the necessity for three cubic yards of fertilizer for one plant unreasonable; his interviews with employees at hydroponic stores that sell growing equipment revealed an average plant requires only one liter of fertilizer. A cubic yard contains 764 liters. Based on his conversations with hydroponic store employees and individuals at dispensaries, Officer Diaz testified it costs about $23 for chemicals, fertilizer, and soil to grow each plant and $10 in seed, for a total of $33, not counting water and labor. On the high side, adding in the cost of water, an average plant would cost $50 to produce; if each plant yielded 16 ounces of usable marijuana, the cost per ounce would be $3.12.

Under Officer Diaz's analysis, if defendant's plants yielded an average of 12 ounces each and each plant required $50 in expenditures, then it cost defendant $4.17 per ounce. Therefore, defendant's statement that each ounce cost him $100 was not reasonable. According to Officer Diaz, if it cost defendant $5 to grow an ounce and he sold it for $100 an ounce, then defendant's sale would yield $95 profit per ounce; given a yield of 12 ounces per plant, defendant's profit would be $1,140 per plant.

According to Officer Diaz, the size of an average joint for medicinal use is about 0.2 gram to 0.5 gram depending on the individual. Using 0.5 gram as a base, 350 grams of marijuana would produce 700 "joints," or marijuana cigarettes. In Officer Diaz's analysis, the average joint produces a high lasting between three and four hours. Using three hours as a base, 700 joints would last 2,100 hours, or 87-1/2 days.

During cross-examination Officer Diaz testified marijuana can be eaten in baked goods, such as brownies. He had no knowledge of baking marijuana and could not estimate the amount needed to produce brownies or other edibles. He was not familiar with defendant's medical needs. When Officer Diaz estimated the expense of raising each plant, he did not factor in time, labor, or extra equipment. His review of the evidence did not reveal any pay/owe sheets or a cell phone, both indicia of marijuana sales.

7

**Defense Case**

### *Ross's Testimony*

Defendant's son Ross, a passenger in the car when Officer Simpson pulled them over, testified. He had a medical marijuana recommendation and bought marijuana from dispensaries "every month or so." From the dispensaries, Ross usually bought an ounce for $300 or $400, which was put in medicine bottles with a label. Ross also purchased brownies or cookies from the dispensaries.

At the dispensary, Ross took classes about growing marijuana and did volunteer work. After volunteering and taking classes, Ross and defendant could grow their own medicinal marijuana within prescribed limits. Any extra marijuana grown could be donated to the dispensary. Ross sometimes made exchanges with dispensaries.

Defendant was not selling marijuana; the dispensary was compensating him for the time and effort it took to produce it. Ross testified that when a grower receives money in exchange for marijuana, it is similar to a sale. Defendant shared with Ross the money he received from the dispensary.

Ross, defendant, and Ross's grandmother all had recommendations and together grew marijuana. Although they were allowed 18 plants total, they grew only nine. The plants yielded between 12 ounces and a pound of marijuana each and required watering for a couple of hours every other day.

In addition to the marijuana he grew, Ross would sometimes buy about an ounce for $300 to $400. The ounce would last a couple of weeks to a month, depending upon whether it was smoked or eaten. Brownies require four to five ounces of marijuana, which would be doubled if you were baking for two patients. In Ross's experience, 12 ounces would be a year's worth of smoking; edibles would require more.

The day they were pulled over, Ross and defendant were on their way to see Ross's grandmother. When Officer Simpson stopped them, defendant and Ross gave him

their recommendations. Officer Simpson smelled marijuana and asked if they had any; they told him where the marijuana was.

The items in the console belonged to defendant; the items in the green bin in the trunk belonged to Ross. Defendant put the marijuana into the duffle bag and the bag into the cooler. Ross saw the cooler when he put his bag into the trunk. Defendant told Ross as they drove that the marijuana was in the trunk. Ross testified the marijuana was from their grow, and half the marijuana in the cooler belonged to him.

When Ross was interviewed he told the officer that defendant loaded the duffle bag in the cooler and he did not know how much was in it. Ross said eight ounces were his and the $500 was compensation defendant received from the dispensaries.

### *Defendant's Testimony*

Defendant, 53 when he was arrested, suffered a bad fall in his early 40's, breaking many bones and requiring a body cast. As a result of at least 22 years of construction work, defendant also suffers from arthritis. Since 2008 he has had four operations and a pain relief prescription for Vicodin. Defendant's mother's addiction to painkillers made him wary of narcotics. As an alternative, defendant got a recommendation for medical marijuana.

Defendant joined a marijuana dispensing collective and closed marijuana cooperative, Delta Health and Wellness (DHW). Defendant signed a membership agreement that included the following: "No diversion, sales, and/or distribution of your medication is allowed. DHW has a zero tolerance in this area. A violation will result in membership termination. Your excess that you grow must go to a legal Collective and never be diverted to non-patients."

Defendant also visited another dispensary, and he attended nine classes on the effects of, growing, medicinal use of, and recipes for marijuana. Defendant and his mother tend to use the marijuana more in edible form, which has a greater impact on bodily pain.

9

Defendant's initial attempt to grow medical marijuana indoors yielded less than spectacular results at a cost of $900 in fans, lights, and other equipment. He moved the surviving plants outside and spent another $700 on soil, fertilizer, and expensive glass. Collective members came to defendant's home and helped with the garden.

In November of 2009 defendant, Ross, and defendant's mother had nine plants that they shared. Defendant put 50 to 60 hours into growing the marijuana.

The day Officer Simpson stopped him, defendant had gone to DHW because they asked him to bring two kinds of marijuana. Defendant packed the marijuana into two bags and used a scale to ensure that each bag was less than eight ounces, as the dispensary recommended. He put the bags of marijuana into a backpack. At the collective, members took the backpack containing the marijuana to a room in the back while defendant waited in the patient area. The members brought the backpack back to defendant with the zipper shut. The DHW members told him they could not use all the marijuana. Inside the backpack, they placed $500 wrapped in paper. Defendant put the bag in the trunk and drove home.

Defendant testified the items in his car's center console, including the container with the blue lid, belonged to him. The hash would be used to make edibles. The $220 in the console was money he earned doing odd jobs. The $500 in the cooler was money defendant received from the dispensary. The small plastic baggies belonged to his ex-wife, who ran a craft business. After defendant saw similar baggies at the dispensary, he tried to give them to the dispensary, which refused them. Defendant did not use the baggies to sell marijuana.

During the stop, Officer Simpson did not seize a tub of brownies that defendant made and brought to the dispensary to see if they would be acceptable. Nor did Officer Simpson seize the screens and other equipment used to wash marijuana to produce THC for use in the edible marijuana.

10

Defendant testified that during the traffic stop he felt pressured by Officer Simpson to use the word "sold" instead of donated, and defendant "felt like it would get him off of me if I just said it." However, defendant testified he did not sell marijuana to people; instead, he used the word "donate" to describe the transactions. Defendant believed the collective set the price of marijuana; he did not ask for a specific price.

Under the terms of his contract with the collective, defendant brought his medical marijuana to the collective. Defendant believed this was legal. He gave the collective four ounces. Defendant had been contributing a great deal of marijuana to the collective and believed he was paid $500 for his participation in the collective. When the collective paid him, the collective said it was compensating for what it took. Defendant also donated time, not just marijuana, although it was not until the collective took his marijuana that he received the money. On cross-examination, defendant acknowledged donations are not usually compensated. Defendant believed it was normal to be compensated for donating marijuana under his agreement with the collective.

**Verdict and Sentencing**

The jury found defendant guilty of possession of marijuana for sale, but not guilty of transportation of marijuana or possession of concentrated cannabis. The trial court granted defendant formal probation for three years with various conditions, including that he serve 180 days in jail, with 60 days stayed upon successful completion of probation. The court also ordered defendant to register as a narcotics offender. Defendant filed a timely notice of appeal.

**DISCUSSION**

**Instructional Error**

Defendant contends the trial court failed to properly instruct on the medical marijuana defense provided by the Medical Marijuana Program Act in conjunction with the possession of marijuana for sale count. In addition to the instructions the court gave on defendant's medical marijuana defense, defendant argues the jury should have been

11

instructed, as to the possession of marijuana for sale count, that (1) a qualified patient who possesses marijuana for personal use is not subject to criminal liability under section 11359, (2) a patient may possess up to eight ounces of dried marijuana, (3) a patient is entitled to receive reasonable compensation for medical marijuana provided to a legally operated collective, and (4) the prosecution bears the burden of proving beyond a reasonable doubt that defendant was not authorized to possess the marijuana for medical purposes.

**Compassionate Use Act**

In 1996 the voters passed Proposition 215, the Compassionate Use Act of 1996, which states in part: "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).)

The Legislature passed Senate Bill No. 420 in 2003, which established the Medical Marijuana Program Act, effective January 1, 2004. (§§ 11362.7-11362.83; Stats. 2003, ch. 875, § 2.) This act extends protection against criminal liability to patients transporting marijuana for medical use and to caregivers who transport, process, administer, deliver, or give away marijuana for medical purposes. The Medical Marijuana Program Act recognizes a qualified right to collective cultivation of medical marijuana. (§ 11362.775.)

In addition, pursuant to section 11362.81, subdivision (d), on August 25, 2008, the California Attorney General issued "Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use" (Guidelines) <http://ag.ca.gov/cms_attachments/ press/pdfs/n1601_medicalmarijuanaguidelines.pdf> (as of Jan. 10, 2014). The purpose of the Guidelines is to ensure that marijuana grown for medicinal purposes remains secure and does not find its way into illicit markets, to help police perform their duties

12

effectively and in accordance with the law, and to help patients understand how they may cultivate, transport, possess, and use medical marijuana under California law. (*People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1009.)

The Guidelines establish that although California law does not expressly recognize dispensaries, a collective or cooperative growing operation that dispenses medicinal marijuana through a storefront may be lawful under section 11362.775. (Guidelines, *supra*, at pp. 9-11.) Groups seeking to collectively grow marijuana within the meaning of section 11362.775 should adhere to the formal requirements, refrain from distributing marijuana outside the group, and operate on a nonprofit basis. (Guidelines, *supra*, at pp. 9-11.) Under the Guidelines, "dispensaries that merely require patients to complete a form summarily designating the business owner as their primary caregiver — and then offering marijuana in exchange for cash 'donations' — are likely unlawful." (*Id.* at p. 11.) Although the Guidelines are not binding, we give them considerable weight. (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 748.)

**Defendant's Requested Instructions**

Prior to trial, the defense requested that the jury be instructed regarding sections 11362.765, 11362.77, and 11362.775, and the possession of marijuana for sale count. The defense proposed the following three instructions:

First requested instruction: "Compassionate Use Act prevents qualified patients from being subject, on that sole basis, to criminal liability under Health and Safety Code Sections 11359 or 11360. However, the [C]ompassionate Use Act does not authorize any individual or group to cultivate or distribute marijuana for profit."

Second requested instruction: "A qualified patient may possess no more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature plants per qualified patient. A qualified patient may possess amounts of marijuana consistent with this article."

13

Third requested instruction: "Qualified patients who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under Section 11357, 11359, or 11360."

The prosecution objected to only the second requested instruction, based on *People v. Kelly* (2010) 47 Cal.4th 1008, in which the Supreme Court struck down the marijuana limits provided for in the instruction and held that a qualified patient can possess only an amount reasonably necessary to meet his or her current medical needs. According to the prosecution, the second requested instruction conflicted with the limits in *Kelly*. However, the prosecution conceded that defendant relied on the limits in the instruction because the events in question occurred prior to *Kelly*. The court postponed any decision on the instruction, and further instruction discussions were off the record.

**Instructions Given**

The court instructed the jury with CALCRIM No. 251: "The crimes charged in this case requires [*sic*] proof of the union, or joint operation, of act and wrongful intent.

"For you to find a person guilty of the crimes in this case, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime. [¶] . . . [¶]

"The specific mental state required for the crime of Possession for Sale of Marijuana, which is charged in Count 2, is knowledge of the presence of the marijuana and knowledge of its nature and character as a controlled substance. The specific intent required for this crime is the specific intent to sell marijuana."

The court also instructed the jury on possession for sale of marijuana with CALCRIM No. 2352: "The defendant is charged in Count 2 with possessing for sale marijuana, a controlled substance.

"To prove that the defendant is guilty of this crime, the People must prove that:

14

"1.  The defendant possessed a controlled substance;

"2.  The defendant knew of its presence;

"3.  The defendant knew of the substance's nature or character as a controlled substance;

"4.  When the defendant possessed the controlled substance, he intended to sell it;

"5.  The controlled substance was marijuana;

"and

"6.  The controlled substance was in a usable amount.

"*Selling* for the purpose of this instruction means exchanging the marijuana for money, services, or anything of value.

"A *usable amount* is a quantity that is enough to be used by someone as a controlled substance.  Useless traces are not usable amounts.  On the other hand, a usable amount does not have to be enough, in either amount or strength, to affect the user.

"*Marijuana* means all or part of the *Cannabis sativa L.* plant, whether growing or not, including the seeds and resin extracted from any part of the plant.

"Two or more people may possess something at the same time.

"A person does not have to actually hold or touch something to possess it.  It is enough if the person has control over it, either personally or through another person."  In addition, the court instructed on the lesser included offense of simple possession of marijuana.

The court instructed the jury that the Compassionate Use Act defense was available for the transportation of marijuana, simple possession of marijuana, and possession of concentrated cannabis charges.  (CALCRIM Nos. 2361, 2375, 2377.)  The jury was not instructed on the act as a defense for the possession of marijuana for sale charge.

The court instructed the jury as to the Medical Marijuana Program Act and Compassionate Use Act defenses with regard to the lesser included offense of simple

15

possession of marijuana:  "Possession of marijuana is lawful if authorized by either the Compassionate Use Act or the Medical Marijuana Program.

"The Compassionate Use Act allows a person to possess marijuana for personal medical purposes when a physician has recommended such use.  The amount of marijuana possessed must be reasonably related to the patient's current medical needs.

"The Medical Marijuana Program allows a qualified patient to possess no more than eight ounces of dried marijuana and to maintain no more than six mature or 12 immature marijuana plants.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess marijuana for medical purposes.  If the People have not met this burden, you must find the defendant not guilty of this crime."  (CALCRIM No. 2375.)

The court further instructed the jury that "[t]he Compassionate Use Act does not authorize any individual or group to cultivate or distribute marijuana for profit."  Finally, the court instructed:  "The Compassionate Use Act allows qualified patients to associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes.  You may not find the defendant guilty of the crimes charged in counts 1, 2, or 3, or the lesser offense of the crime charged in count 2, based solely on the fact that he associated with other qualified patients in order collectively or cooperatively to cultivate marijuana for medical purposes."[4]  The court did not instruct with the sentence defendant requested:  "A qualified patient may possess amounts of marijuana consistent with this article."

---

[4]  It is actually the Medical Marijuana Program Act that provides this defense, not the Compassionate Use Act.  (*People v. Urziceanu* (2005) 132 Cal.App.4th 747, 785.)

16

**References in Closing Arguments**

During closing argument, the prosecution argued defendant intended to sell the marijuana and defendant possessed the marijuana in a way inconsistent with possessing it for medical needs. According to the prosecution, "the defenses of the defendant being a qualified patient simply don't apply in this case.

". . . The idea that he donated the marijuana to the dispensary, and then they compensated him for his donation . . . [t]hat's exchanging marijuana for money, which is the definition of a sale according to the jury instruction."

The prosecution also addressed possible defenses: "You can't have a medical marijuana card and get pounds of marijuana and start selling it to anybody on the street and use that card as a shield . . . . So you need to look at the defenses as they exist and see if they apply to [defendant's] actions. . . .

"The first one . . . is the possession for sale of marijuana . . . because when you look at the instruction for Count 2, there is no defense there for being a qualified patient for having a medical marijuana card. It's not a defense. Just because you have a medical marijuana card, doesn't mean you get to sell marijuana. So when you're looking at Count 2, the fact that the defendant had a medical marijuana card, doesn't even come into play." Defense counsel objected and the court instructed the jurors, "Remember what I told you is if anything that what the attorney says conflicts with what I tell you, you follow the law."

The prosecution continued: "You look at the instructions. The defense is listed for transportation of the Compassionate Use Act [*sic*]. The defense is listed for the lesser included defense of possession of more than an ounce of marijuana. The defense is included for the possession of concentrated cannabis. It's included right there in the instruction. It's not included in possession for sale of marijuana. It doesn't apply.

17

". . . Even if you were allowed to, the law is crystal clear you cannot sell marijuana to anybody for any reason if you're making a profit . . . the number[s] here show clearly the defendant was making a profit."

In addition, the prosecution discussed collectives: "The Compassionate Use Act allows qualified patients to associate within the State of California in order to collectively or cooperatively cultivate marijuana for medical purposes. . . . [I]f you're working together, we can't charge you with . . . possession for sale . . . because there are three, four, five people working together to cultivate marijuana. [¶] . . . [¶]

"The People outside of [defendant], Ross Hudson, and [defendant's] stepmother -- nobody else was involved in the cultivation of that marijuana. Yeah, he took classes at the dispensary, but that's not being involved in the cultivation of the marijuana. So he goes outside of his group, that small group of three people, to give the marijuana to other people. Since the people that he was giving the marijuana to had nothing to do with its cultivation, they're not allowed to have that marijuana. So all of these actions fall outside the protections that he's given as a medical marijuana patient . . . ."

Defense counsel argued: "[T]he whole crux of this case is about is [*sic*] the collective, and [defendant's] participation in the collective. And it is a defense. It is an absolute defense.

"It says: You may not find the defendant guilty of the crimes charged in Counts 1, 2, 3, or the lesser crime charged in two based solely on the fact that he associated with other qualified patients and in order to collectively or cooperatively cultivate marijuana for medical -- medicinal purposes. That's what a cooperative is. People grow their marijuana, and then they collectively take it together. When you have yours, you bring it in, and then at other times you don't, take it out."

Defense counsel also argued: "The law says you can be part of it. You can't profit from it. And that's the deal. That's the crux of the case. And that's for you to decide whether or not he was profiting from it. He wasn't.

18

"Officer Diaz talked about it costs five dollars an ounce for that, but he didn't include any time and labor for that. And that's something you also have to consider.

"You also have to consider if you're part of a collective, and part of it you're putting in and then eventually you're [taking] out. And he was part of that collective. . . . He signed to be part of it. And part of it is . . . that his excess that he grows must go to [the] collective and never be diverted to non-patients.

"As Officer Diaz said an average plant yields between one and two pounds . . . but you can't have more than eight ounces.

"What do you do with the excess? They're in a catch twenty-two position. . . . [T]he law says that you can be part of a collective, which is what [defendant] was. You can't profit from that. And I would submit to you he didn't . . . ." Defense counsel also stated defendant exchanged the marijuana as part of a collective and did not profit from the exchange.

**Jury Questions**

The second day of jury deliberations, the jury asked: "For compassionate use - simple possession 2375 code 11357(c) states a qualified patient can poss. for personal medical use no more than 8 oz of marijuanna [*sic*]. Is this also true for patient to [possess] while transporting pot? Does the possession of 8 oz apply accross [*sic*] all compassionate use laws?"

The court replied: "I refer you to the instructions. In particular, see instruction 2361, which is specific to the crime charged in Count 1, transporting marijuana. The last paragraph of that instruction discusses the Compassionate Use Act as it applies to this crime." The jury deliberated for several more hours before reaching a verdict.

**Discussion**

The trial court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles

19

refer to those principles closely and openly connected with the facts before the court and necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.) Before giving an instruction, the court must find legally sufficient evidence in the record to support the finding or inference that the instruction permits. (*People v. Hannon* (1977) 19 Cal.3d 588, 597.) " '[A] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*.' [Citation.]" (*In re Christian S.* (1994) 7 Cal.4th 768, 783, first brackets added by this court.)

We review de novo the court's ruling on instructions, independently reviewing the record when the trial court refuses an instruction requested by the defense based on a lack of substantial evidence. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581-584.) We uphold the trial court's ruling unless the record contains substantial evidence to support the requested instruction. (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1269-1270.) We assume jurors are intelligent and capable of understanding and correlating all instructions given by the court. (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)

Defendant mounts a multifaceted challenge to the court's instructions on count 2, possession of marijuana for sale. In essence, defendant argues the court's instructions allowed the jury to convict him based on his exchange of money for marijuana, even if he did not profit from the exchange. According to defendant, the court should have instructed the jury regarding his medical marijuana defense under the Medical Marijuana Program Act and on the prosecution's burden of proof.

Defendant begins by arguing the court erred in failing to instruct that a qualified patient who possesses marijuana for his own personal use is not subject, on that sole basis, to criminal liability under section 11359 (possession of marijuana for sale). However, the court instructed as to count 2's lesser included offense of simple possession that under the Compassionate Use Act a person can possess marijuana in an amount "reasonably related to the patient's current medical needs" when a physician has

recommended such use. In addition, the court instructed that under the Compassionate Use Act qualified patients can collectively or cooperatively cultivate marijuana for medical purposes, and "You may not find the defendant guilty of the crimes charged in counts 1, 2, or 3, or the lesser offense of the crime charged in count 2, based solely on the fact that he associated with other qualified patients in order collectively or cooperatively to cultivate marijuana for medical purposes." These instructions adequately informed the jury that it could not convict defendant simply because he possessed marijuana for personal use.

Second, defendant faults the trial court for failing to inform the jury that a qualified patient may possess up to eight ounces of dried marijuana. The court instructed the jury in conjunction with the lesser included offense of simple possession in count 2: "Possession of marijuana is lawful if authorized by . . . the Medical Marijuana Program. [¶] . . . [¶]

"The Medical Marijuana Program allows a qualified patient to possess no more than eight ounces of dried marijuana and to maintain no more than six mature or 12 immature marijuana plants."

Defendant argues this "does not necessarily mean that the jury recognized that the instruction applied to count 2 as well." We disagree. The instruction informed the jury that a qualified user could lawfully possess eight ounces of marijuana; the jury would naturally conclude this level of legal possession applied to a charge of possession for sale as well as simple possession. Nor are we convinced by defendant's argument that to " 'possess no more than eight ounces' " and to possess " 'up to eight ounces of marijuana' " are not the same. Defendant argues the former is a "restriction" on the amount of marijuana and the latter is an "authorization" on the amount of marijuana. Such semantic niceties aside, there is no reason to believe the jury failed to properly understand, and properly apply, the amount authorized by the Medical Marijuana Program Act.

21

Third, defendant contends the court improperly failed to instruct that a qualified patient is entitled to receive reasonable compensation for the marijuana provided to a legally operated medical marijuana cooperative. Defendant argues the court had a duty to so instruct based on language in the Guidelines citing section 11362.765, subdivision (c), stating that a "dispensing collective or cooperative may credit its members for marijuana they provide to the collective, which it may then allocate to other members." (Guidelines, *supra*, at p. 10.)

We disagree. The jury understood, pursuant to the court's instructions, that qualified patients can associate in order to collectively cultivate marijuana for medicinal purposes and that defendant could not be found guilty based solely on that fact. In addition, the court informed the jury that "[t]he Compassionate Use Act does not authorize any individual or group to cultivate or distribute marijuana for profit." Therefore, the jury knew that defendant could associate with other patients in the collective to provide marijuana but could not cultivate or distribute marijuana for profit; unless defendant received compensation above and beyond his costs, defendant's actions in providing marijuana were not illegal. An instruction on reasonable compensation was not necessary.

Finally, defendant faults the trial court for failing to instruct that the prosecution bore the burden of proving beyond a reasonable doubt that defendant was not authorized to possess the marijuana for medical purposes. However, the court instructed the jury in connection with the lesser included offense to count 2, simple possession, that "[t]he People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess marijuana for medical purposes." There is no reason to suspect, as defendant argues, that the jury might have failed to recognize that the burden applied to count 2 as well.

22

## Expert Witness Testimony

Defendant challenges Officer Diaz's qualifications to offer an opinion as to whether the marijuana was possessed for sale, rendering his testimony insufficient to support defendant's conviction for possession of marijuana for sale. According to defendant, Officer Diaz did not have experience being a vendor with a legal marijuana cooperative and never provided medical marijuana to a collective as a member. Defendant contends his sufficiency of the evidence claim was not forfeited by defense counsel's failure to object.

## Forfeiture

The People concede that a claim of evidence insufficient to support the verdict is not subject to forfeiture. However, the People argue defendant is not challenging the sufficiency of the evidence but is instead challenging the admissibility of Officer Diaz's testimony. Recently in *People v. Dowl* (2013) 57 Cal.4th 1079, the Supreme Court held that a defendant's failure to object at trial to a proferred expert's qualifications forfeits appellate review of whether the evidence is sufficient to establish that the witness was qualified to testify as an expert that the defendant possessed the marijuana for purposes of sale. (*Id*. at pp. 1088-1089.) The court also concluded: "Nevertheless, despite his failure to object, defendant may argue on appeal that the evidence put before the jury at trial— including the officer's opinion testiony—was insufficient to establish he possessed the marijuana for purposes of sale." (*Id*. at p. 1089.) Accordingly, we consider defendant's challenge to the sufficiency of the evidence.

## Sufficiency of the Evidence

On appeal, we review the entire record to determine whether it contains evidence that is reasonable, credible, and of solid value on the basis of which any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We review the evidence in the light most favorable to the

judgment and presume in support of the judgment every fact the trier could reasonably deduce and infer from the evidence. (*Ibid*.)

Defendant argues Officer Diaz had no experience providing medical marijuana to a collective and, in exchange, receiving compensation. Nor did Officer Diaz have any experience in how collectives compensate members when they provide marijuana to a collective. According to defendant, Officer Diaz misstated the law when he testified that a person with a medical marijuana recommendation cannot take excess marijuana to a dispensary. Officer Diaz also admitted he lacked expertise in cooking marijuana to produce edibles.

In support, defendant relies on *People v. Hunt* (1971) 4 Cal.3d 231 (*Hunt*) and *People v. Chakos* (2007) 158 Cal.App.4th 357 (*Chakos*). In *Hunt*, the defendant was convicted of unlawful possession for sale of a restricted dangerous drug but not guilty of unlawful possession of two other restricted dangerous drugs, some of which were found in his conceded possession. (*Hunt*, *supra*, 4 Cal.3d at pp. 233-234.) The Supreme Court found the evidence insufficient to support the judgment. The officer who testified that the drugs were held for sale had extensive training, education, and experience relating to the possession of and trafficking in dangerous drugs. (*Id*. at p. 234.) However, the Supreme Court found: "In cases involving possession of marijuana and heroin, it is settled that an officer with experience in the narcotics field may give his opinion that the narcotics are held for purposes of sale based upon matters such as quantity, packaging, and the normal use of an individual. On the basis of such testimony convictions of possession for purposes of sale have been upheld. [Citations.]

"A different situation is presented where an officer testifies that in his opinion a drug, which can and has been lawfully purchased by prescription, is being held unlawfully for purposes of sale. In the heroin and marijuana situations, the officer experienced in the narcotics field is experienced with the habits of both those who possess for their own use and those who possess for sale because both groups are

24

engaged in unlawful conduct. As to drugs, which may be purchased by prescription, the officer may have experience with regard to unlawful sales but there is no reason to believe that he will have any substantial experience with the numerous citizens who lawfully purchase the drugs for their own use as medicine for illness." (*Id*. at pp. 237-238.) Therefore, in the absence of evidence not to be expected in connection with the lawful use of drugs, an officer's opinion that possession of lawfully prescribed drugs is for purposes of sale "is worthy of little or no weight and should not constitute substantial evidence sufficient to sustain the conviction." (*Id*. at p. 238.)

In *Chakos*, the defendant, who possessed six ounces of marijuana, was convicted of possession for sale. The conviction was based on the testimony of the arresting deputy sheriff. The deputy testified as both a percipient witness and an expert. (*Chakos*, *supra*, 158 Cal.App.4th at pp. 359-360, 361.) A search of the defendant's car and home yielded the marijuana, $781 in cash, a doctor's medical slip for lawful marijuana use, 99 empty baggies, a scale, and a closed circuit camera system. (*Id*. at pp. 360-361.) According to the deputy, the totality of the circumstances led him to conclude the marijuana was possessed for sale. These circumstances included the precise quantity of marijuana found in the car, which was not packaged for personal use but was more consistent with marijuana for sale. This, coupled with the scale, packaging material, and surveillance camera system, led to the deputy's conclusion. (*Id*. at pp. 361-362.)

The appellate court found the deputy's testimony insufficient to support the defendant's conviction. The deputy had general and narcotics training in drug identification and in the growing, selling, and packaging of marijuana, and he had assisted in more than 100 narcotics investigations. He had spoken to people who bought and sold marijuana about the amounts they used and had seized indoor grows. (*Chakos*, *supra*, 158 Cal.App.4th at p. 361.) However, the deputy had never arrested anyone with a medical marijuana recommendation. (*Id*. at p. 362.) The court, relying on *Hunt*, found the deputy lacked expertise in the medical use of marijuana. (*Id*. at pp. 363-369.)

25

The *Chakos* court noted that *Hunt* preceded the Compassionate Use Act, when no possession of marijuana was lawful. (*Chakos*, *supra*, 158 Cal.App.4th at p. 365.) The court found: "[T]hat kind of expertise—expertise in distinguishing lawful patterns of possession from unlawful patterns of holding for sale—is what is conspicuously missing in the case before us. As with the officer in *Hunt*, Deputy Cormier's expertise is in cases where defendants *by definition* 'are engaged in unlawful conduct.' [Citation.] The only evidence on the point was that he had 'contact with investigations' concerning such individuals. Mere and undefined 'contact' with undefined 'investigations' is manifestly not *substantial* evidence that an officer is in any way familiar with the patterns of individuals who, under state law, may lawfully purchase marijuana pursuant to a physician's certificate under the Compassionate Use Act, nor does it show any expertise in the ability to distinguish lawful from unlawful possession." (*Id.* at pp. 367-368.) Accordingly, the court found the expert "unqualified to render an *expert* opinion in this case" and concluded the evidence was insufficient to support the defendant's conviction of possession of marijuana for sale. (*Id*. at p. 369.)

In so finding, the court found the officer's inconsistent testimony about the various amounts found in the defendant's car and apartment reflected a lack of expertise concerning legal marijuana use. In addition, the court noted: "One might posit, then, that individuals who may lawfully possess marijuana under state law for medicinal purposes will have patterns of purchase and holding that will reflect the practical difficulties in obtaining the drug. Those practical difficulties could also explain the gram scale—anyone with the lawful right to possess marijuana will need to take precautions, not to ensure that he or she does not get 'ripped off' by a dealer, but that he or she does not possess *more than* the eight ounces contemplated by the act. Practical difficulties of obtaining the drug also explain why a patient entitled to possess it under state law might want to keep an extra supply on hand *within* the legal amount, since supplies would not be reliable." (*Chakos*, *supra*, 158 Cal.App.4th at p. 368.)

26

Here, unlike the scenario in *Chakos*, Officer Diaz provided numerous, unambiguous details to support his opinion that defendant possessed the marijuana for sale. Defendant possessed 12 ounces of marijuana. The marijuana was placed in the car's trunk, in a duffle bag inside an ice cooler. This placement, Officer Diaz testified, suggested an effort to conceal the marijuana, with the cooler used to mask the smell. Officer Diaz also noted the presence of twenty-five $20 bills, another six $20 bills, a $100 bill, and 17 small clear plastic baggies. This cache indicated to Officer Diaz that defendant possessed the marijuana for sale, not to be traded at the collective.

Although defendant asserts that Officer Diaz lacked experience with marijuana collectives, the officer testified he had spoken with medicinal marijuana users and was familiar with the growing process. In addition, Officer Diaz testified he interviewed medicinal marijuana users who sell, donate, or provide marijuana to cooperatives and discussed how they furnish marijuana.

Officer Diaz testified he visited two marijuana dispensaries on three occasions while undercover. During his visits he spoke with employees about how much marijuana they purchase for the dispensary from individuals with medical marijuana recommendations and the ways in which they buy it. He also spoke with dispensary employees about how they sell medical marijuana to recommendation holders. They sold him marijuana in an "eight ball," or 3.5 grams, but they also sold larger quantities. Although some medical prescriptions specify amounts of marijuana, usually there is no prescribed amount. Officer Diaz testified the aim of a marijuana collective is to share marijuana, labor, and costs equally.

Defendant also asserts that Officer Diaz lacked familiarity with the amounts needed to bake marijuana into edibles. Officer Diaz admitted he was not an expert in the culinary use of marijuana; such an admission was for the jury to consider in assessing the weight to give the officer's testimony regarding possession of marijuana for sale.

In cases involving possession of marijuana, an experienced officer may give an opinion as to whether the marijuana is held for purposes of sale, based on factors such as quantity, packaging, and normal use by an individual.  However, as to drugs that may be purchased by prescription, an officer's opinion that possession of lawfully prescribed drugs is for purposes of sale is worth little or no weight in the absence of evidence of some circumstances not to be expected in connection with a patient lawfully using the drug medicinally.  (*People v. Newman* (1971) 5 Cal.3d 48, 53.)  Here, Officer Diaz's testimony contained just such circumstances and provided sufficient evidence to support the jury's finding that defendant possessed the marijuana for sale.

## DISPOSITION

The judgment is affirmed.


       RAYE       , P. J.



We concur:



   NICHOLSON   , J.



   MURRAY   , J.


28